# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 30, 2020         Decided May 26, 2020

No. 18-5122

CHRISTOPHER J. CODE,
APPELLANT

v.

RYAN D. MCCARTHY, SECRETARY, U.S. DEPARTMENT OF THE
ARMY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00031)

*Nathan S. Mammen* argued the cause for appellant. With him on the briefs were *Hannah L. Bedard* and *Matthew J. McIntee*.

*John B. Wells*, *Raymond J. Toney*, and *Brian D. Schenk* were on the brief for *amicus curiae* Military-Veterans Advocacy, Inc. in support of appellant.

*Jeremy A. Haugh*, Special Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney at the time the brief was filed, and *R. Craig*

*Lawrence*, Assistant U.S. Attorney.  *Roberto C. Martens Jr.*, Special Assistant U.S. Attorney, entered an appearance.

Before: TATEL, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  Lieutenant Christopher Code asked the Army Board for the Correction of Military Records (the Board or ABCMR) to expunge or amend Army investigators' determinations recorded in his military files. The records at issue stated that credible information and probable cause existed to believe that Code committed the criminal offenses of making a false official statement with intent to deceive and obtaining services under false pretenses. The allegedly false statement was the expiration date of Code's current military orders, which he wrote in a blank on the 2007-2008 school year registration form to re-enroll his three children at the Fort Buchanan base school that they had attended since 2005.  The Secretary of the Army claims Code's provision of that date was a false pretense that he used to obtain an additional year of schooling for his children when, the Army alleges, Code knew they were not entitled to that service.

When Code filled out the school form on April 30, 2007, he was under orders assigning him to Fort Buchanan for three years, from July 2005 to July 2008.  Where the school registration form stated "I am active duty and my current orders will expire on _____," Code filled in "July 2008."  Army investigators apparently at first believed Code's assignment was for two years, not three; they opened a fraud investigation on that premise.  It is by now undisputed, however, that the assignment was for three years.  The investigation did not lead to any criminal prosecution or military discipline.  Yet, when Code sought to have the allegations and charges removed from

his military records, the Board denied his application and the district court sustained its decision. Because a basic mistake of fact renders the Board's decision arbitrary and capricious, we reverse.

## BACKGROUND

### A. Legal Context

The U.S. Department of Defense operates elementary and secondary schools to serve families of individuals who live and/or work on military installations where appropriate local free public education is not available to their dependents. *See* 10 U.S.C. § 2164(a)(1)-(2); Department of Defense Instruction (DoDI) 1342.26 ¶¶ 1, 6.2 (1997). The children of active duty military members, including those who live outside such an installation, may receive "tuition-free education at an installation." DoDI 1342.26 ¶¶ 6.2.1.1, 6.2.2.1. Eligibility for tuition-free education is "based upon the permanent duty station to which the military sponsor [*e.g*., the parent] is assigned by official orders." *Id.* ¶ 6.3.3. Anticipating possible changes in a sponsor's duty station, the governing statute and policy provide that, "[i]f the status of the sponsor of a currently enrolled student changes so that the child would no longer be eligible for enrollment" at the military installation's school, "enrollment may continue for the remainder of the school year." *Id*. ¶ 6.3.7; *see* 10 U.S.C. § 2164(h)(1) ("The Secretary of Defense shall permit a dependent of a member of the armed forces . . . to continue enrollment in an educational program provided by the Secretary . . . for the remainder of a school year notwithstanding a change during such school year in the status of the member . . . that, except for this paragraph, would otherwise terminate the eligibility of the dependent to be enrolled in the program.").

Under the Uniform Code of Military Justice (UCMJ), a person commits the offense of making a false official statement when he, "with intent to deceive[,] (1) signs any false record, return, regulation, order, or other official document, knowing it to be false; or (2) makes any other false official statement knowing it to be false." 10 U.S.C. § 907(a). A person commits larceny under the UCMJ when he "wrongfully takes, obtains, or withholds, by any means, from the possession of the owner or of any other person any money, personal property, or article of value . . . with intent permanently to deprive or defraud another person of the use and benefit of property or to appropriate it" for his own use or use by another. *Id*. § 921(a)(1). The UCMJ also makes it a criminal offense to, "with intent to defraud, knowingly use[] false pretenses to obtain services." *Id*. § 921b. As relevant here, all three offenses require proof of wrongful intent, and both false statement and false pretenses specifically require intent to defraud.

As soon as a Department of Defense Criminal Investigative Organization has "credible information that" the subject of an investigation "committed a criminal offense," it must place the subject's name and identifying information in the title block of an investigative report—a step known as "titling." DoDI 5505.7 ¶¶ 6.1, 6.5 (2003). The Department of Defense defines credible information as "[i]nformation disclosed or obtained by a criminal investigator that, considering the source and nature of the information and the totality of the circumstances, is sufficiently believable to lead a trained investigator to presume that the fact or facts in question are true." *Id*. ¶ E1.1.1. Concurrent with titling, the investigative organization must list the subject's name in the Defense Central Index of Investigations (DCII), a searchable database used by the Department of Defense's security and investigative agencies and selected other federal agencies "to

determine security clearance status and the existence/physical location of criminal and personnel security investigative files." *Id*. ¶ E1.1.3. The subject's identifying information "shall be removed from the title block of a report of investigation and the DCII" only "in the case of mistaken identity" or if it is "determined a mistake was made at the time the titling and/or indexing occurred in that credible information indicating that the subject committed a crime did not exist." *Id*. ¶ 6.6.

When and if investigation "adequately substantiate[s]" the commission of a criminal offense such that investigators have "probable cause supported by corroborating evidence" to believe that the subject in fact committed the crime, the military investigative organization may issue an investigative report supporting its determination that the offense is "founded." Army Regulation 190-45, ¶ 4-3(a) (2007); *id.* Glossary § II, "Founded offense"; *see* Appellee's Br. 26. If investigators determine that no crime was committed, the offense is reported as "unfounded." *See* Army Regulation 190-45 Glossary § II, "Unfounded offense."

Individuals who believe their military file contains an error may request that the Secretary of the military department that created the record make corrections to it. *See* 10 U.S.C. § 1552. Secretaries generally rely on civilian boards to review and act on requests for correction. *Id*. § 1552(a)(1). The Secretary of the Army reviews correction applications through the Army Board for the Correction of Military Records, a board of civilians "vested with broad authority to 'correct any military record when it considers it necessary to correct an error or remove an injustice.'" *Wolfe v. Marsh*, 835 F.2d 354, 357 (D.C. Cir. 1987) (alterations omitted) (quoting 10 U.S.C. § 1552). The Board must "[r]eview all applications that are properly before [it] to determine the existence of error or injustice," 32 C.F.R. § 581.3(b)(4)(i); "direct or recommend

changes" where needed to correct an error or injustice, *id*. § 581.3(b)(4)(ii); recommend hearings "when appropriate in the interest of justice," *id*. § 581.3(b)(4)(iii); and "[d]eny applications when the alleged error or injustice is not adequately supported by the evidence," *id.* § 581.3(b)(4)(iv). The burden rests with the applicant to "prov[e] an error or injustice by a preponderance of the evidence." *Id*. § 581.3(e)(2). When a titling/indexing decision is under review, the reviewing body "shall consider the investigative information available at the time the initial titling/indexing decision was made." DoDI 5505.7 ¶ 6.9.

## B. Factual Record

Christopher Code was an officer in the U.S. Navy and is now a member of the Navy Reserve. On July 25, 2005, Code began a three-year tour of duty at Fort Buchanan Army Base in San Juan, Puerto Rico. *See* Navy Personnel Command, Official Change Duty Orders for Lt Christopher John Code (Jan. 24, 2005) (J.A. 421); Memorandum from the Dep't of Def., San Juan Military Entrance Processing Station, to Fort Buchanan Family Hous. (July 25, 2005) (J.A. 471); *Code v. Esper*, 285 F. Supp. 3d 58, 61-62 (D.D.C. 2017); Appellee's Br. 10. During that tour of duty, Code and his family lived in off-base housing and his three children attended the Department of Defense school at the Fort Buchanan base.

Sometime between January and March of 2007, Code learned that he was likely to receive new "permanent change of station" orders assigning him somewhere else before his current orders assigning him to Puerto Rico expired in July 2008. Fla. Fraud Resident Agency, Army CID, Agent's Investigation Report (Jan. 25, 2008) (J.A. 405); Code Decl. ¶ 6 (J.A. 455). Because his elderly father had only recently moved to live with Code's family in Puerto Rico, Code's preference

was to remain at Fort Buchanan for the full three years if possible.  With the support of his superiors, Code applied on March 12, 2007, for a one-month extension of his then-current orders which, if granted, would keep him at Fort Buchanan through August 2008.

In a letter dated Thursday, April 26, 2007, the Navy's department of human resources denied the extension request, describing it as a request for a "thirteen-month extension." Letter from Head, Human Res. Cmty., to Lt. Christopher Code (Apr. 26, 2007) (J.A. 430).  Code asserts, and the Secretary does not dispute, that he did not receive the denial letter until Tuesday, May 8, 2007, as evidenced by a faxed copy of the letter with a heading showing the date of May 8, 2007.

Meanwhile, Code's three children were attending the Fort Buchanan school, where they had been enrolled since Code's tour in Puerto Rico began in 2005.  Registration for the upcoming school year was in progress.  *See* Oral Arg. Rec. 22:13-37; *see also* DoDI 1342.26 ¶ 6.3.4.3 (referencing May enrollment deadline).  On Monday, April 30, 2007, Code submitted an application to reenroll the children for the 2007-2008 school year.  Where the enrollment form stated: "I am active duty and my current orders will expire on _____," Code filled in "July 2008," as he presumably had done each of the prior two years.  Suppl. DoDEA Form 600 – School Year 2007-2008 (Apr. 30, 2007) (J.A. 223).  The form also stated that "if my orders change/terminate before the start of the SY 2007-2008, I will notify the registrar immediately."  *Id.* Although Code did not sign his name on the line appearing next to that statement, he signed the bottom of the form, under a statement averring the veracity of information provided.

As Code later explained under oath, "[a]t the time I submitted the paperwork, I did not yet know that my request

for extension had been denied and still believed that my extension request would be granted." Code Decl. ¶ 7 (J.A. 456). But school enrollment forms were due, and there is no contention that the Code family was rushing to submit theirs early. *See* Oral Arg. Rec. 22:13-37. As of April—the same time of year the Code family had applied the prior year—the school was urging parents of currently enrolled children to submit any 2007 reenrollment forms. Code's wife told the school's Registrar of the possibility that Code would receive early change orders, in advance of his current orders' July 2008 expiration date. Code attests that the Registrar "advised my wife that my children's eligibility to attend the [Fort] Buchanan school for the 2007-2008 term was tied to my current orders, which at that point still had me stationed in San Juan through July 2008." Code Decl. ¶ 8 (J.A. 456).

On May 23, 2007, Code received change-of-station orders directing him to report for duty in Kingsville, Texas, in June 2007. Code attests that, "[i]mmediately upon receipt" of his new orders, he notified the Registrar, who assured him that the children could stay at the Fort Buchanan school, because "eligibility was based on my Orders at the time of enrollment." *Id.* ¶ 9; Suppl. Code Decl. ¶ 2 (J.A. 497). Pursuant to his orders, Code reported to Kingsville in June 2007. His wife and children, together with Code's father, remained in Puerto Rico for the time being, and the children attended the Fort Buchanan school during the 2007-2008 school year.

In November 2007, base police in Puerto Rico became aware that the Code children were attending the Fort Buchanan school while Code was stationed elsewhere. In January 2008, the Florida Fraud Resident Agency of the U.S. Army Criminal Investigation Command (known as the "CID" because it was formerly called the Criminal Investigation Division) opened an investigation into whether Code's children were fraudulently

enrolled in the Fort Buchanan school. The Army CID first interviewed an unnamed First Sergeant at the Military Entrance and Processing Station at Fort Buchanan. The First Sergeant erroneously informed the CID that the orders assigning Code to Fort Buchanan, which were in effect when Code completed the school enrollment form, expired "sometime during the summer months" of 2007. Fla. Fraud Resident Agency, Army CID, Agent's Investigation Report (Jan. 25, 2008) (J.A. 405). As noted above, it is undisputed that Code's current orders at the time he submitted the form assigned him to Fort Buchanan until July 2008.

Without yet having contacted Code, the Army CID interviewed the Fort Buchanan school Registrar on January 25, 2008. There is no record whether the investigator asked about the Registrar's *actual* conversations with Code or his wife. The interview report reflects only that the Army CID presented to the Registrar *hypothetically* "the scenario involving Lt. Code." Fla. Fraud Resident Agency, Army CID, Agent's Investigation Report (Jan. 25, 2008) (J.A. 404). The Registrar responded with her then-current understanding that (in retrospect) she believed Code's children would have been ineligible to register for or attend the school "since the sponsor, Lt. Code was no longer assigned or stationed in Puerto Rico." *Id.* She then stated that Code did not fit any applicable exceptions, including an exception that she described as allowing children to "finish the school year, if the school year was in progress (Sep[tember] through May)" when the sponsor received new orders. *Id.* She appears to have been referring to the rule providing that "[i]f the status of the sponsor of a currently enrolled student changes so that the child would no longer be eligible for enrollment . . . , enrollment may continue for the remainder of the school year." DoDI 1342.26 ¶ 6.3.7; *see* 10 U.S.C. § 2164(h)(1).

In late July 2009, the Army CID also queried by email the Navy human resources officer who had sent Code the April 26, 2007, letter notifying him that his extension request had been denied. The Army CID wished to know "the date Lt. Code received the letter of denial," given "the closeness on the dates of the false statement (30 Apr 07) and the date of the letter of denial of extension (26 Apr 07)." Fla. Fraud Resident Agency, Army CID, Agent's Investigation Report (July 30, 2009) (J.A. 441). The officer responded:

> If you are trying to prove that he intentionally defrauded the local school by saying he thought his extension was approved, I can affirm with absolute confidence that I personally told him otherwise within no more than a few days after the date on letter, and certainly we issued him transfer orders, which presumably he executed, which once again would indicate that he knew he was no longer eligible to use the school.

*Id.* (J.A. 441-42).

At some point during the investigation, the Army CID obtained a copy of Code's orders assigning him to Fort Buchanan in July 2005. Those orders, as confirmed by Code's commanding officer when he signed in for duty, authoritatively established that Code was assigned to Fort Buchanan from July 25, 2005, until July 25, 2008. *See* Navy Personnel Command, Official Change Duty Orders for Lt Christopher John Code (Jan. 24, 2005) (J.A. 421); Memorandum from the Dep't of Def., San Juan Military Entrance Processing Station, to Fort Buchanan Family Hous. (July 25, 2005) (J.A. 471) (copy of memorandum from Code's commanding officer certifying that Code's "tour is from July 25, 2005, to July 25, 2008"). The district court found that that the Army CID's description of

Code's tour as a "twenty-four month tour, ending in the summer of 2007 . . . does not appear to have been an accurate description of [Code's] orders" because his "tour in Puerto Rico was initially scheduled to last for three years, concluding in the summer of 2008," and specifically noted that Code's orders expired in July 2008. *Code*, 285 F. Supp. 3d at 62. The Secretary's own brief tells us that Code's "tour of duty in Puerto Rico was to be from August 2005 until July 2008" and that Navy personnel advised Code he would receive new change of station orders before his "current orders expired in July 2008." Appellee's Br. 10 (quoting J.A. 471). At oral argument, counsel for the Secretary confirmed that Code's orders "expired on [their] face, by [their] terms . . . in 2008," and that the Secretary did not "contest[] that, in fact, Lt. Code was given orders to be at Fort Buchanan, Puerto Rico, initially . . . [until] 2008." Oral Arg. Rec. 16:26-35, 17:27-42. Those were Code's "current orders" until his tour of duty was cut short by issuance on May 23, 2007, of Permanent Change of Station orders sending him to the Naval Air Station at Kingsville, Texas.

Nonetheless, as the Army CID later summed up its reasoning, "Mr. Code was aware, or should have been aware that his dependents were not authorized [sic] the services, which is why he would have provided the false date to ensure his dependents could enroll." Memorandum from the Army CID to Director, Army Review Bds. Agency, at 2 (May 26, 2016) (J.A. 314). The Army CID stressed that this was "reiterated" by the CID at its February 2008 interview with Code. *Id*.

The children openly attended the Fort Buchanan school throughout the 2007-2008 school year. The school is run by the Department of Defense, which manages its enrollment according to priorities established by Department of Defense

regulation. *See* DoDI 1342.26 ¶ 6.2.2. The February 2008 interview was the first that Code learned about any potential problem with his children's enrollment. *See* Code Decl. ¶ 10 (J.A. 456). There is no evidence that the school at any point—either before or after the CID's February 2008 interview with Code—asked the family to remove the children from the school or otherwise took steps to exclude them.

In its earliest report in the record, the Army CID stated on July 30, 2009, that it had what it believed was both "credible information" and "probable cause" to believe that Code made a false statement on April 30, 2007, when he submitted the application form to the Fort Buchanan school for his three children for the 2007-2008 school year. Based on Domestic Dependent Elementary and Secondary School (DDESS)-Puerto Rico tuition rates, the Army CID calculated that the "monetary loss to the U.S. Government [was] $44,200." Army CID, Report of Investigation - 3rd Status, at 2 (July 30, 2009) (J.A. 227). The investigators referred the putative debt to the Defense Finance and Accounting Service for collection. On September 30, 2010, the Accounting Service initiated debt collection against Code.

The Army CID concluded its investigation on January 12, 2011, issuing a final report that determined there was

> [p]robable cause to believe Lt. Code committed the offense of False Official Statement and Larceny when he falsified documentation by registering his three children in the DDESS for a year while he was not assigned to the geographic area. Lt. Code knowingly falsified these DDESS documents 4 days after his Permanent Change of Station (PCS), extension request was denied, transferring him from Puerto Rico to Kingsville, TX.

Army CID, Report of Investigation - Final, at 2 (Jan. 12, 2011) (J.A. 398-99). The Army CID noted that it had referred the case to the U.S. Attorney's Office in San Juan but that the U.S. Attorney had declined to prosecute, leaving to the Department of Defense and Code's chain of command whether to take any action against him. Defense Department personnel declined to take any prosecutorial or disciplinary action.

## C.   Procedural History

Code applied first to the Army CID itself, then to the Army Board for Correction of Military Records, for expungement or correction of the Report of Investigation—that is, to vacate the CID's titling and probable-cause determinations. Code explained that he could not have made a false official statement because the registration form asked specifically and exclusively for the date of expiration of his "current orders," which, when he signed the registration form, he accurately stated were set to expire in July 2008.

The Army CID and Board nonetheless denied relief, and Code timely sought review in district court. The district court identified several inadequacies in the Board's decision, including the Board's application of the wrong regulation to determine the eligibility of Code's children and its failure to address Code's challenge to the Army CID's referral of the investigative report to the Defense Finance and Accounting Service to initiate collection. Over Code's objection, the district court granted the Secretary's motion for voluntary remand to allow the Board to "address the inadequacies" raised by Code's complaint. *Code v. McHugh*, 139 F. Supp. 3d 465, 472 (D.D.C. 2015).

The Board issued a second decision reinstating and bolstering its initial decision of almost three years earlier. The Board denied any relief in Code's favor, instead taking the

occasion to recommend that the Army CID amend the Report of Investigation to substitute a charge of obtaining services under false pretenses for the inapposite larceny charge. *See* ABCMR, Record of Proceedings (Jan. 31, 2017) (J.A. 110). The Board determined that, while the behavior the CID ascribed to Code did not amount to larceny, Code could instead be re-titled with, and have founded against him, an offense of obtaining services under false pretenses, which "contemplate[s] the wrongful obtaining of services rather than tangible property." *Id*. ¶ 19 (J.A. 141).

Code returned to the district court to pursue his claim that the Board's denial of relief from the titling and probable-cause determinations was arbitrary and capricious. He continued to contend that the Army CID lacked any evidence of a false statement, given that "the information [Code] submitted on the application was completely true and accurate." Am. Compl. ¶ 2, *Code v. Speer*, No. 15-cv-31 (D.D.C. Apr. 13, 2017), ECF No. 17.

Ruling on cross-motions for summary judgment, the district court held "that there was nothing arbitrary, capricious or contrary to law about the [Board]'s conclusion that there was sufficient evidence to support the CID's decision to title [Code] with the charges of Obtaining Services under False Pretenses and Making a False Official Statement." *Code*, 285 F. Supp. 3d at 61. The district court emphasized that both the CID and the Board had concluded that Code's statement "that 'I am active duty and my current orders will expire on July 2008'" was "a purposeful misrepresentation of the true nature of [Code's] orders because, at the time he made this statement, [Code] knew that his 'current orders' were actually going to 'expire' in the near future, and that he was going to be required to leave Puerto Rico long before 2008." *Id.* at 67. The district

court did not separately address Code's challenge to the probable-cause determination.

On appeal, Code renews his contention that he made no false statement because, at the time he filled out and signed the school enrollment form asking him for the date his "current orders will expire," his current orders assigned him to Fort Buchanan until July 2008. He contends that the Board's failure to expunge or amend the titling, indexing, and probable-cause finding was therefore arbitrary and capricious under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2)(A).

## DISCUSSION

Three principles control our review. First, "[o]n review of a district court's grant of summary judgment in connection with the appeal of a decision of the ABCMR [Army Board for Correction of Military Records], we review the ABCMR's decision *de novo*, applying the same standards as the district court" and with "no particular deference to the judgment of the district court." *Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012) (citations and internal quotation marks omitted).

Second, "under section 706(2) of the [APA], this court shall 'set aside' the ABCMR's 'action, findings, and conclusions' regarding the correction of military records if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). The Secretary's "broad discretion in administering the correction of military records" does not obviate the APA's requirement that administrative actions "be supported by 'reasoned decisionmaking.'" *Id.* (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)); *see*

*also Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989).

Third, we have recognized that, "when a military records correction board fails to correct an injustice clearly presented in the record before it, it is acting in violation of its statutory mandate under 10 U.S.C. § 1552. And such a violation, contrary to the evidence, is arbitrary and capricious." *Haselwander*, 774 F.3d at 996 (alterations omitted) (quoting *Yee v. United States*, 512 F.2d 1383, 1387 (Ct. Cl. 1975)).

We also have noted that "[a] Correction Board can only exercise its discretion for the benefit of the individual member." *Wolfe*, 835 F.2d at 358. In view of that constraint, it is not clear that the Board acted within the scope of its authority when it suggested that Code could be re-titled with a new offense. But because Code does not press that argument, *see* Oral Arg. Rec. 10:42-58, and prevails on other grounds, we do not resolve it now.

## A. Probable Cause

The Secretary has forfeited any defense of the Army CID's probable-cause determination. In neither its initial review nor its review on remand from the district court did the Board separately address Code's contentions that the CID lacked probable cause to conclude that he had committed fraud. Rather than account for the Board's omissions, counsel for the Secretary asserts that it was Code who failed to preserve his challenge to probable cause on summary judgment in the district court. Oral Arg. Rec. 12:57-13:29. That is wrong. Not only at summary judgment, but also at every other opportunity, Code has asked for the probable cause determination to be reversed or expunged—and has challenged as arbitrary and capricious the Board's failure to do so. *See* Appellant's

Br. 33-34; Pl.'s Req. for Recons. at 1, *Code v. Speer*, No. 15-cv-31 (D.D.C. Jan. 16, 2018), ECF No. 29; Pl.'s Mem. in Support of His Cross-Mot. for Summ. J. & in Opp'n to Def.'s Mot. for Summ. J. at 13, *Code v. Speer*, No. 15-cv-31 (D.D.C. Jan. 16, 2018), ECF No. 20-1; Am. Compl. ¶ 113, *Code v. Speer*, No. 15-cv-31 (D.D.C. Apr. 13, 2017), ECF No. 17; Compl. ¶¶ 77-78, *Code v. McHugh*, No. 15-cv-31 (D.D.C. Jan. 9, 2015), ECF No. 1; Letter from Andrew K. Wible, Cohen Mohr LLP, to Army Review Bds. Agency, at 1 (Sept. 26, 2013) (J.A. 369); Letter from Andrew K. Wible, Cohen Mohr LLP, to U.S. Army Crime Records Ctr., at 1 (Jan. 24, 2013) (J.A. 389). We reverse the district court's decision insofar as it declines to hold arbitrary and capricious the Board's failure to engage with Code's challenge to the probable-cause determination.

In any case, for essentially the same reasons explained below in connection with the titling and indexing decision, the Board's determination of probable cause to believe that Code defrauded the Department of Defense cannot stand.

## B. Titling and Indexing

We hold arbitrary and capricious the Board's decision affirming the Army CID's titling and indexing decision.

**1.** Review of a titling and indexing decision is unusual, but it is called for here by several circumstances particular to this case.

First, the case appears before us without a record that separately identifies whatever initial, presumably limited, body of evidence the Army CID relied on to decide to title and index Code for criminal fraud. Applicable regulations suggest that titling is akin to a threshold reason-to-believe or reasonable-suspicion standard, typically made at the very outset of an

investigation. As Department of Defense rules explain, "[t]itling and indexing . . . shall be done as early in the investigation as it is determined that credible information exists that the subject committed a criminal offense." DoDI 5505.7 ¶ 6.1. The earliest determination in the record before us, however, is reflected in the July 30, 2009, Report of Investigation, in which the titling and probable cause determinations are merged. That Report was "generated to correct identifying on the subject [sic], change the offenses from U.S. Code to UCMJ, and list the offenses as founded." Army CID, Report of Investigation - 3rd Status, at 2 (July 30, 2009) (J.A. 225). We have no record of any threshold titling and indexing determination apart from and in advance of the Report that also found probable cause, nor has the Secretary explained how we might otherwise isolate the information that was available to the investigators at the investigative threshold. In fact, we lack any distinct evidentiary record underpinning the 2009 titling, indexing, or founding decisions; this appeal came to us on the record supporting the 2011 final Report of Investigation. *See* Army CID, Report of Investigation - Final (Jan. 12, 2011) (J.A. 398-445).

Another unusual twist in this case is that the decision appears to be having an impermissible continuing effect on Code. As conceded by the Secretary and reflected in the record, the Army appears to be relying exclusively on the challenged titling decision to seek to collect from him the value of the education that it asserts Code obtained for his children under false pretenses. Ordinarily, a titling decision is superseded and largely mooted by a finding of probable cause. Reporting an offense as "founded" reflects that investigation has "adequately substantiated" the charge, giving law enforcement "probable cause supported by corroborating evidence" to believe the crime was committed. If the investigation yields a determination of no probable cause to

believe that a crime was committed, the offense is reported as "unfounded." *See* Army Regulation 190-45, ¶ 4-3(a); *id.* Glossary § II (defining "Founded offense" and "Unfounded offense"). Titling and indexing, on the other hand, "are administrative procedures and shall not connote any degree of guilt or innocence." DoDI 5505.7 ¶ 6.5. Department of Defense policy therefore confines the use of titling and indexing to "law enforcement or security purposes" and forbids "[j]udicial or adverse administrative actions . . . against individuals or entities based solely on the fact that they have been titled or indexed due to a criminal investigation." *Id.* ¶¶ 6.2, 6.5.2.

Notwithstanding the prohibition against sole reliance on a titling decision as grounds for "adverse administrative actions," counsel for the Secretary asserts that the Defense Finance and Accounting Service may continue to seek to collect from Code the cost of his three children's year of schooling at Fort Buchanan based on the titling decision alone. *See* Oral Arg. Rec. 36:55-37:37 (counsel for the Secretary stating that "[t]he titling decision would still be adequate" to support the Department's claim of entitlement to recoup tuition costs from Code), 38:36-57; *see also* Def. Fin. & Accounting Serv., Advisory Opinion: Department of Defense Education Activity (DoDEA) Debt Situation Involving Navy Lt Code, at 3 (Oct. 13, 2016) (J.A. 213) ("The fact that [Code] was not charged with a crime does not negate this debt to the US Government."). The record suggests that the Department of Defense does indeed plan to continue to seek to collect in excess of $40,000 from Code based on the mere suspicion that he obtained those services by fraud. The Defense Finance and Accounting Service notified Code of the putative tuition debt only because the Army CID forwarded to the Accounting Service the Report of Investigation reflecting both the titling and probable cause determinations. *See* ABCMR, Record of

Proceedings ¶ 6 (Jan. 31, 2017) (J.A. 112). The Accounting Service did not distinguish between titling and probable cause when it insisted that it would not cancel the debt or cease efforts to recoup it unless the Army CID "overturned" its prior determination. Letter from Bridgette Chrisman, Customer Care Representative, Def. Fin. & Accounting Serv., to Christopher J. Code (Apr. 20, 2012) (J.A. 201); *see also* Def. Fin. & Accounting Serv., Advisory Opinion: Department of Defense Education Activity (DoDEA) Debt Situation Involving Navy Lt Code, at 1 (Oct. 13, 2016) (J.A. 211); Email from Leonard Cooley, Def. Fin. & Accounting Serv., to Maria Sanchez, Army Review Bds. Agency (May 3, 2016, 12:21 EDT) (J.A. 244); *but see* Memorandum from the Army CID to Director, Army Review Bds. Agency, at 1 (May 26, 2016) (J.A. 313) (stating that the Defense Finance and Accounting Service, "not CID, is the determining body responsible for recouping funds").

**2.** Because of the evident continuing harm to Code from the Board's refusal to correct the record titling and indexing him for crimes of making a false official statement and procuring services under false pretenses, we review those decisions and hold that they were arbitrary and capricious. The record of titling and indexing presented to the Board and reviewed by the district court did not credibly suggest that Code falsified the Fort Buchanan school enrollment form, nor that he did so as a ruse to get his children school access they did not deserve. We therefore cannot agree with the district court that the Board "provided a reasoned explanation of its decision that is rationally related to the evidence before it" when it held that credible information supported the Army CID's titling and indexing determinations that Code knowingly submitted a false enrollment form, thereby committing crimes of fraud and obtaining services by false pretenses. *Code*, 285 F. Supp. 3d at 68.

The record submitted in support of titling and indexing reflects the Army CID's determination that Code fraudulently "certified his date of departure" as July 2008 on the enrollment form, and that it rested those threshold determinations on interviews and "examination of records and military orders" showing that Code "was assigned" to his post at the Fort Buchanan Military Entrance and Processing Station (MEPS) on August 3, 2005, and "the tour at MEPS was twenty-four months." Army CID, Report of Investigation - 3rd Status, at 3-4 (July 30, 2009) (J.A. 226-27). Investigators purported to have determined that, "[a]t the time Lt. Code signed the DoDEA Form 600 on 30 Apr 07, he knew that his P[ermanent] C[hange of] S[tation] was in June 07, and as such his dependent children were not eligible for attendance at the DOD school on [Fort] Buchanan." *Id.* at 4 (J.A. 227). The Army CID's final report likewise announced that "Code falsified documentation by registering his three children in the DDESS for a year while he was not assigned to the geographic area," basing its inference of fraudulent intent on its conclusion that Code did so "4 days after his Permanent Change of Station (PCS)[] extension request was denied, transferring him from Puerto Rico to Kingsville, TX." Army CID, Report of Investigation - Final, at 2 (Jan. 12, 2011) (J.A. 399).

The Army CID's investigators made a simple but consequential mistake at the outset and then compounded their error when they should have corrected course. It is apparently not unusual for a tour of duty at the Military Entrance and Processing Station to last only two years. The Army CID's first error was to accept—apparently without checking the records—the statement of the First Sergeant at the Military Entrance and Processing Station that Code's 2005 assignment to Fort Buchanan was due to expire in the summer of 2007. *See* Fla. Fraud Resident Agency, Army CID, Agent's Investigation Report (Jan. 25, 2008) (J.A. 405). Accepting the First

Sergeant's accusation, the Army CID concluded that Code was seeking at the tail end of his assignment to enroll his children in the Fort Buchanan School for an additional year—a year during which he already knew (according to the Army CID) he would no longer be assigned to Fort Buchanan. Second, failing to discern that, even without extension, Code's then-current orders lasted until July *2008*, not July 2007, the Army CID jumped to further erroneous conclusions: that Code already knew when he submitted the school enrollment form that his request for extension had been denied, and that he also knew, even before his reassignment to Texas, that he would have to leave Fort Buchanan in 2007.

At the time of their initial titling and indexing decision, the Army CID investigators presumably had it within their power to verify the premise of their fraud theory. The record of the titling and indexing decisions includes Code's official orders. It is uncontested that Code's orders assigned him to Fort Buchanan from 2005 to 2008. The Secretary now acknowledges that official records authoritatively contradict any information that might have led the Army CID to think that Code's assignment to Puerto Rico was for only 24 months. *See* Oral Arg. Rec. 16:10-38. Code never denied that the assignment was subject to change. But the Secretary also does not contest that Code's superiors supported his application to serve out—and even slightly extend—his assignment at Fort Buchanan through August 2008, giving Code grounds for optimism that he might stay. In any event, it is clear and undisputed that no changed orders had yet issued when Code filled out the school's application form in April 2007. Therefore, the only factually accurate way for Code to fill out the form when he did was to write "July 2008" in the blank where the form states "My current orders will expire on _____." Suppl. DoDEA Form 600 – School Year 2007-2008 (Apr. 30, 2007) (J.A. 223). Code's request for

correction of the titling decision is therefore "supported by uncontested, creditable evidence," and the Board's decision otherwise "defies reason and is devoid of any evidentiary support." *Haselwander*, 774 F.3d at 992-93.

Code has consistently acknowledged that, at the time he signed the application, he had heard that his orders were likely to be changed. Indeed, by Code's uncontradicted account, the family informed the school's Registrar in April that Code anticipated early reassignment elsewhere, and, after his Permanent Change of Station order came through in late May, Code contacted the Registrar again to verify the children's eligibility. *See* Code Decl. ¶¶ 8-9 (J.A. 456). The Registrar assured him, Code attested, that the children could stay at the Fort Buchanan school, because "eligibility was based on my Orders at the time of enrollment." Suppl. Code. Decl. ¶ 2 (J.A. 497). The way the application form is worded is not to the contrary.

The Board did not deem Code's account unworthy of belief for any reason, but rejected it for want of corroboration, "such as a statement from the Registrar," which, the Board opined, "would appear to be easily obtained." ABCMR, Record of Proceedings ¶ 4 (Aug. 12, 2014) (J.A. 364). But it is not at all apparent how Code could have obtained such a statement. Tellingly, the Army CID's own interview of the Registrar—at which the investigator in 2008 hypothetically posed to her the "situation" involving Code's children—failed to contradict Code's account of his actual conversation with her in 2007. Fla. Fraud Resident Agency, Army CID, Agent's Investigation Report (Jan. 25, 2008) (J.A. 404). If she had told Code that children are ineligible once their parent is reassigned elsewhere, or if the Codes had in fact never asked her about their children's eligibility, one would expect the Registrar to have said so. The omission from the Army CID's interview

report of any statement on the Registrar's part regarding her actual communications—or lack thereof—with the Code family tends to corroborate Code's declaration.

## C.   The Alternative, Failure-to-Disenroll Theory

The Secretary has fleetingly suggested that the charged offense of obtaining services under false pretenses is separately supported by Code's action in *keeping* the children enrolled in school at Fort Buchanan after his Permanent Change of Station orders sent him to Texas.  Oral Arg. Rec. 30:05-31:06; *see also* ABCMR, Record of Proceedings ¶ 19 (Jan. 31, 2017) (J.A. 141).  But the only falsehood or fraud the Army CID identified was that Code submitted a school application for the 2007-2008 school year listing July 2008 as the date his assignment to Fort Buchanan was due to expire.  The Board itself described the sole issue before it as whether to expunge records of the CID investigators' determination that "there was credible evidence to believe [Code] fraudulently obtained education services from the government and did so by means of a false official statement."   ABCMR, Record of Proceedings ¶ 28 (Jan. 31, 2017) (J.A. 144).  We cannot sustain the Board's decision on a different ground, neither charged nor litigated in this case.

As explained above, the sole falsehood anywhere in the record of the Army CID's investigation was the statement Code made on the school application form on April 30, 2007, that his "current orders" expired on "July 2008."   In its interim and final titling decisions, the CID found that Code "falsely listed his [order expiry date] of July 2008," Army CID, Report of Investigation - 3rd Status, at 2 (July 30, 2009) (J.A. 225), and concluded that there was "probable cause to believe Lt. Code committed the offense of False Official Statement and Larceny when he falsified documentation by registering his three

children in the DDESS for a year while he was not assigned to the geographic area," Army CID, Report of Investigation - Final, at 2 (Jan. 12, 2011) (J.A. 399).

Even if the Army had made, the Board upheld, and briefing preserved a charge of fraudulent failure to disenroll, a titling and indexing decision made on that theory must fail because it is unsupported by any credible information that Code acted with fraudulent intent when he persisted in sending his children to the Fort Buchanan school. This alternative theory assumes that the application itself was not fraudulent and that the children were permissibly re-registered at the Fort Buchanan school, but that Code knew that his children became ineligible once his new Permanent Change of Station orders came through yet failed at that time to withdraw them from the school.

Because state of mind is what differentiates mere error from criminal fraud, a charge of fraudulent failure to withdraw could not be made without credible information that the suspect acted with fraudulent intent. *See generally United States v. Project on Gov't Oversight*, 616 F.3d 544, 552 & n.9 (D.C. Cir. 2010) (collecting cases). But the Army CID never identified any credible information on which to conclude that Code knew that his children lost their school eligibility simultaneously with his change of orders, and hence that he knowingly violated an obligation to take them out of school. The Board only gets part of the way with its contention that Code's "change of station orders taking him to Texas had the obvious effect of making him and his family ineligible for tuition-free education at the Fort Buchanan school." ABCMR, Record of Proceedings ¶ 27 (Jan. 31, 2017) (J.A. 144). We assume that the Board is correct that, under Department of Defense policy, Code's reassignment rendered his children ineligible. But that does not mean Code *knew* they were ineligible. And, contrary

to the Board's characterization, the eligibility rules for children of a servicemember who moves are far from "obvious." *Id*.

Department of Defense law and rules tying eligibility to where the servicemember is stationed include an exception allowing "currently enrolled students" to remain throughout a school year, even after their parent-sponsor has been assigned elsewhere. The statute states that

> [t]he Secretary of Defense shall permit a dependent of a member of the armed forces . . . to continue enrollment in an educational program provided by the Secretary . . . for the remainder of a school year notwithstanding a change during such school year in the status of the member . . . that, except for this paragraph, would otherwise terminate the eligibility of the dependent to be enrolled in the program.

10 U.S.C. § 2164(h)(1). In similar terms, the implementing rule provides that, "[i]f the status of the sponsor of a currently enrolled student changes so that the child would no longer be eligible for enrollment," the student's enrollment nonetheless "may continue for the remainder of the school year." DoDI 1342.26 ¶ 6.3.7.

The record contains no credible information that Code knew no such exception applied to his children. Indeed, Code's unrebutted declaration attests to the contrary: When Code informed the Fort Buchanan school Registrar that he had been reassigned to Texas, she assured him that the children could complete the year at the Fort Buchanan school because they had validly enrolled based on his prior assignment. *See* Suppl. Code Decl. ¶ 2 (J.A. 497). Even if that view misapprehends the relevant rule, as the Secretary now argues and we assume, it is entirely plausible that the Registrar so understood it when she spoke to Code.

Indeed, the plausibility of Code's account of his understanding based on his exchange with the Registrar gains powerful support from the Army's own inconsistent usage of the term "enrolled." The Secretary now argues that children are only "enrolled" within the meaning of the currently-enrolled-student exception once classes are underway in the corresponding school year, whereas Code was reassigned during the summer before school had resumed for the fall term, making his children ineligible to "continue enrollment" under the exception. Appellee's Br. 42; *see* Oral Arg. Rec. 31:07-35. The Registrar's post-hoc response to the hypothetical posed by the Army CID also narrowly construed enrollment to refer only to attendance while "the school year was in progress (Sep[tember] through May)." Fla. Fraud Resident Agency, Army CID, Agent's Investigation Report (Jan. 25, 2008) (J.A. 404). But the Board and counsel for the Secretary on this appeal themselves all repeatedly used the term "enrollment" to refer to registration, without regard to whether classes were yet underway. *See, e.g.*, Memorandum from the Army CID to Director, U.S. Army Crime Records Ctr. (Apr. 4, 2013) (J.A. 383) ("Code committed the offenses [of] False Official Statement and Larceny when he *enrolled* his children prior to the start of the 2007-2008 school year . . . ."); ABCMR, Record of Proceedings ¶¶ 19, 27 (Jan. 31, 2017) (J.A. 141) (noting that Code "is accused of fraudulently *enrolling* his children into the Fort Buchanan school"); Appellee's Br. 9, 11; Oral Arg. Rec. 30:48-54 ("They had only been *enrolled*. So they hadn't actually started school.") (all emphases added). The Board's and government counsel's equation of registration and enrollment is inconsistent with the Department of Defense's reading of its own rule, but it reinforces the plausibility of Code's understanding, avowedly on the Registrar's advice, that despite his reassignment his children were "enrolled" and so eligible to remain at the Fort Buchanan School under the exception for currently enrolled students.

Ultimately, the Secretary's case for fraudulent failure-to-disenroll rests on the "presumption of administrative regularity" the ABCMR accords official actions. 32 C.F.R. § 581.3(e)(2); *see* Appellee's Br. 43-44 (citing *Roberts v. United States*, 741 F.3d 152, 158 (D.C. Cir. 2014)). The Secretary contends that a presumption that government personnel "properly discharge[] their official duties" establishes that, had Code or his wife called the Registrar, she necessarily would have informed them of their children's ineligibility. *Roberts*, 741 F.3d at 158 (quoting 32 C.F.R. § 723.3(e)(2)); Army Board for Correction of Military Records, Record of Proceedings (Aug. 12, 2014) (J.A. 365). The Secretary reasons that Code's affidavits cannot overcome such a presumption without "corroborating evidence"—in particular, a signed statement from the Registrar affirming Code's own declarations that she told him his children could remain at the school through the 2007-2008 school year. Appellee's Br. 43; *see also* ABCMR, Record of Proceedings ¶¶ 4, 8 (Aug. 12, 2014) (J.A. 364-65). To the contrary, once Code identified the absence of evidence supporting the Army CID's actions, it was not his obligation to disprove fraudulent intent. Rather, the issue was that the Army investigators had never met their burden to show it—first with "credible information" for titling and indexing, and then with probable cause to deem the charge "founded." Neither the Army CID, the Board, nor counsel for the Secretary have pointed to any evidence that Code intended to defraud the government—whether when he submitted the enrollment form accurately stating the expiration date of his current orders, or when, after his orders changed, his children continued to attend the Fort Buchanan school where they were enrolled. We reject the extraordinary position that a background presumption of regularity can alone prove criminal intent to defraud, and that a suspect's statement to the contrary under oath cannot rebut such "proof" unless independently corroborated by the very

official benefiting from the presumption—especially where, as here, the administrative process does not appear to provide for any opportunity to question or obtain a statement from the official under oath. *See* 32 C.F.R. § 581.3(c)(2)(iii), (f).

## CONCLUSION

We reverse the judgment of the district court, vacate the decision of the Army Board for the Correction of Military Records, and remand the case to the district court with instructions to remand to the Board for further proceedings consistent with this opinion.

*So ordered.*